Filed 4/27/23  P. v. Castaneda CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS JOSEPH CASTANEDA,<br><br>    Defendant and Appellant. | H048397<br>(Santa Clara County<br>Super. Ct. No. C1905492) |

Defendant Carlos Joseph Castaneda was convicted by a jury of inflicting corporal injury on an intimate partner (Pen. Code, § 273.5, subd. (a))[1] and misdemeanor simple assault (§ 240) and was sentenced to three years in prison.  On appeal, Castaneda argues that the prosecutor committed misconduct multiple times during closing argument by misstating the burden of proof and standard of reasonable doubt, baselessly accusing the defense witnesses of lying, denigrating defense counsel, and burdening Castaneda's constitutional rights by arguing that he used his right to discovery to concoct a defense.  Although we agree that some of the prosecutor's comments constituted misconduct, we conclude that any error was harmless either individually or cumulatively.  We affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

## I.     BACKGROUND

**A.     *The Information***

On July 2, 2019, the Santa Clara District Attorney charged Castaneda by information with inflicting corporal injury on an intimate partner (§ 273.5, subd. (a); count 1), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), second degree robbery (§ 212.5, subd. (c); count 3), and misdemeanor battery on a spouse or cohabitant (§ 243, subd. (e)(1); count 4).  The information further alleged that Castaneda had a prior strike (§ 1170.12) that was also a prior serious felony (§ 667, subd. (a)).

**B.     *The Prosecution's Case[2]***

**1.     *The Offense[3]***

Shortly after midnight on October 25, 2018, Officer Ramon Valverde of the San Jose Police Department was investigating a car crash on Monterey Road and Capital Expressway when an unrelated car came speeding north up Monterey Road.  The car stopped, reversed against traffic, and parked in front of the police cars, blocking the intersection.  The driver, E.Z., got out and told the officers her boyfriend was following her and she needed help.  At the time, E.Z. appeared confused and flustered.  E.Z. eventually identified her boyfriend as Castaneda.

At one point, E.Z. picked up a call from Castaneda, who said:  "You want to play games, you want to stop in front of the cops, huh?"  When Castaneda called again, Valverde tried to speak to him, but Castaneda hung up.  Later, E.Z. said that she thought she saw Castaneda driving away.  Under the streetlights, Valverde could see that E.Z. had

---

[2] After the presentation of the prosecution's evidence, the trial court granted the prosecutor's motion to dismiss counts 3 and 4 due to a lack of evidence.

[3] Video clips from the officers' body-worn cameras, which recorded E.Z.'s initial statements to the officers, were admitted into evidence and played for the jury.

some redness on her face and neck and swelling on the cheekbone area. Valverde did not think that E.Z. was under the influence of alcohol or drugs, so he did not perform any sobriety tests.

E.Z. described Castaneda as jealous and said that he thought she had been "running around, sleeping, like a typical boyfriend." E.Z. said that she had "never been this scared." As she spoke to the officers, Castaneda continued to call E.Z., and she needed help to type in her phone's passcode. E.Z. said that Castaneda had choked her twice in the car to the point where she could not breathe and that he had "sock[ed]" her face and slapped her. E.Z. said that she had been driving back home to Los Baños when Castaneda started following her, and she thought she would have gotten into a car accident if she had not stopped.

San Jose Police Department Officer Ramiro Garcia spoke to E.Z. again at the hospital emergency room after she was transported for medical care. At the time, E.Z. still appeared frightened. She largely reiterated the allegations she made against Castaneda at the scene—that Castaneda had struck her repeatedly and that she had even thought about jumping out of the car to escape him.[4]

### 2. Attempts to Locate E.Z.

There were several unsuccessful attempts to locate E.Z. and bring her to testify at Castaneda's trial. District Attorney Investigator Juan Hernandez was able to speak to E.Z. over the phone nearly a year after the offense, and, at the time, E.Z. said that she was unsure if she wanted to meet with Hernandez and declined to give her current address. E.Z. told Hernandez that she was two months pregnant with Castaneda's baby, though she no longer spoke to him. Hernandez later left a trial subpoena and other documents on the windshield of E.Z.'s car, and he saw E.Z. take the documents. E.Z., however, did not

---

[4] A video clip of E.Z.'s hospital interview was admitted into evidence solely to evaluate E.Z.'s credibility.

follow up with Hernandez. Another investigator, Mark Stevenson, tried to locate E.Z. and drove to E.Z.'s address in Los Baños. Stevenson left his contact information after knocking on the door.

### 3. *Jail Calls*

Several of Castaneda's jail calls were admitted into evidence. In one call, E.Z. and Castaneda expressed their love for each other and their confusion over the criminal charges. E.Z. asked, "[I]f it was for mine, why would they have robbery?" Castaneda responded, "Well, it's not, I don't think it's a robbery charge. I think it's just, um, like forcing fear into somebody or some shit like that. . . ." E.Z. responded, "And even if that, you didn't do anything to me like that." In another call, E.Z. told Castaneda that she had gone through the police reports and saw that the incident happened on October 25, not October 24, and she asked Castaneda what he did. Castaneda responded that he did not do anything. And in another call, Castaneda stated, "All they got is the police report. Same thing that happened with my fucking last case with [N.A.] It's just he said, she said. That's all they have. They don't have anything." Castaneda also said, "I know what I did and I know what I didn't do."

### 4. *Prior Acts Admitted under Evidence Code section 1109*

The prosecutor introduced two of Castaneda's prior convictions into evidence—a conviction for vandalism and a conviction for "violat[ing] . . . 273.5(a)." The prosecutor also presented evidence of the conduct underlying the two convictions as follows:

On August 19, 2015, an employee from a business near the Camera Cinema in downtown San Jose called 911 at the request of a woman, later identified as N.A. The caller reported that the woman was with a man who had threatened to punch another employee and had tried to smash the business's window. N.A. told the 911 dispatcher that Castaneda was the man who had been with her, and he was her ex-boyfriend. N.A. also said that Castaneda had been threatening her and would not leave her alone "for like

4

an hour." The responding officer on arrival saw that one of the cinema's double doors was shattered.

On September 4, 2015, N.A. called 911 and reported that Castaneda had hit her and had broken things inside her house. She also said that she was bleeding from her nose and that Castaneda had run away down the street. The responding officer found N.A. waiting in her car at the front of the house. N.A. had a swollen nose with a bit of blood below it and the beginnings of a black eye.

At trial, N.A. testified that she had problems with alcohol during the five-year period when she was dating Castaneda and could not recall anything about either incident. She did not recall any incidents of violence with Castaneda, though she acknowledged that they frequently argued. N.A. no longer spoke to Castaneda and had not seen him in several years.

N.A. had failed to appear for prior proceedings in the case involving E.Z., and she was present in court to testify only because a detective had arrived at her residence. Investigator Stevenson had transported N.A. to the trial to testify, and she had initially told him that she did not want to be in court if Castaneda was present. Based on N.A.'s facial expressions, Stevenson inferred that she was afraid of Castaneda.

### 5. *Intimate Partner Violence Expert*

Licensed marriage and family therapist Richard Ferry testified that victims of intimate partner violence are often reluctant to report incidents due to fear of retaliation, shame or embarrassment, or a sense that these types of events should be kept private. According to Ferry, many victims of intimate partner violence recant their allegations, refuse to cooperate with the investigation, or refuse to go to court. Victims may fear retaliation and have a continuing "paradoxical attachment" to the abuser. Ferry opined that traumatic bonding may also occur, and victims may have a lingering attachment to their abuser.

5

### C. *The Defense*

Castaneda's defense was that E.Z. had concocted the story about Castaneda's abuse to officers at the scene, and that her visible injuries were the result of a fight that E.Z. had with another woman.

#### 1. *E.Z.'s Interview*

Mariana Alvarez, an investigator with the public defender's office, attempted to contact E.Z. by calling her phone numbers and looking for her addresses. Eventually, Alvarez sent contact letters to "whatever addresses" she could find for E.Z. and visited the residence of E.Z.'s father. After speaking with E.Z.'s father, Alvarez left him a card. About two weeks after Alvarez's visit to E.Z.'s father and E.Z.'s call with Hernandez, Alvarez received a call from a woman who identified herself as E.Z. and said she was responding to one of Alvarez's letters. Alvarez had never met or spoken with E.Z. before, but the woman on the phone was able to provide E.Z.'s identifying information, including her date of birth and driver's license number.[5] Alvarez took notes of the interview with E.Z., but in accordance with office policy, Alvarez did not record or request E.Z.'s consent to record the interview. Also in accordance with office policy, Alvarez destroyed her notes upon completion of her written report of the interview.

Over the phone, E.Z. said that she and Castaneda's relationship had ended sometime in the summer of 2018, when Castaneda started dating someone else.[6] E.Z. explained that she was upset when the relationship ended because she thought that Castaneda had cheated on her with another woman.

---

[5] Alvarez had previously obtained E.Z.'s personal identifying information from the DMV and the police report associated with the case.

[6] E.Z.'s statements to Alvarez were admitted for the limited purpose of impeaching her prior statements to the police at the scene.

E.Z. told Alvarez that on the evening of October 24, 2018, around 10:00 p.m., she and her friend Christina were out driving, drinking, and smoking marijuana, when they ran into the woman that E.Z. believed Castaneda had an affair with. E.Z. said that she had "recognized the girl from photos and . . . mutual friends." E.Z. and the other woman exchanged words and the situation escalated into a physical fight. E.Z. sustained bruises, and Christina left. The other woman also tried to leave, so E.Z. went into her car to pursue her. E.Z. was "really upset" and at some point ended up on the street, blaming Castaneda for the whole situation. E.Z. told Alvarez that she "knew the police weren't going to believe her or try to do anything about it," so she "made up this thing against [Castaneda]."

E.Z. told Alvarez that she did not intend to cooperate with the district attorney because she did not want to get into trouble, having lied to the police. E.Z. was now pregnant with Castaneda's baby, and she thought that the stress from getting involved with the prosecution would cause a miscarriage.

### 2. *Mariah Ruiz Reyes*

Mariah Ruiz Reyes had been friends with Castaneda since middle school and was best friends with Castaneda's sister, Rosa. Reyes had previously hired both Castaneda and E.Z. to work for her at the restaurant that she managed, and she had on occasion worked shifts with both Castaneda and E.Z. Reyes had been in a romantic relationship with Castaneda last year, but they were now just friends. She had not spoken to him for about eight months.

A few days before Halloween last year, Reyes was sitting in a parked car in a parking lot of an apartment complex on Monterey Road drinking alcohol with friends when she saw E.Z. driving by in a car. When E.Z. spotted Reyes, she pulled into the parking lot, got out of her car, and started arguing with Reyes. At the time, E.Z. was with another woman. E.Z. told Reyes that she had seen Castaneda's messages and knew that Reyes and Castaneda "had been talking." The verbal argument turned physical: E.Z.

7

pushed Reyes and pulled her hair, and Reyes grabbed E.Z.'s neck to get her off. Reyes hit E.Z. "more on the right" side of her face, though she thought she struck E.Z. on both sides of her face. The fight seemed to last for "a long time" and ended when Reyes's friend pulled Reyes off E.Z. Reyes saw that E.Z. had a scratch on her neck, and E.Z.'s face was red. Reyes and one of her friends left in a car because they thought they would get into trouble for fighting. She noticed that E.Z. continued to pursue her for about two stoplights.

Reyes told Rosa about the incident with E.Z. shortly after it occurred. However, she did not think much about the incident until she was contacted by a defense investigator a few days before Castaneda's trial. At trial, Reyes conceded that the male voice heard speaking through E.Z.'s phone in the officers' body-worn camera footage sometimes sounded like Castaneda, though Reyes initially denied being able to identify Castaneda's voice in the video.

### 3. *Rosa Castaneda*

Castaneda's sister, Rosa, used to live with Castaneda and knew E.Z., as E.Z. used to frequently visit Castaneda. Rosa recalled that one time in March 2018, Castaneda and Rosa were watching television when E.Z. started to repeatedly call Castaneda on the phone. Castaneda told E.Z. he was just trying to "hang[] out with" his sister, but E.Z. showed up in person about ten minutes later. Rosa thought that E.Z. believed that Castaneda was with another woman. E.Z. looked around the apartment and asked where the other woman was. Castaneda denied that he was with anyone else and told E.Z. that he was just with Rosa. He also told E.Z. that if she continued to behave this way, he would break up with her. E.Z. told Castaneda that he was not going to leave her and started to bang her head against the wall. She also said that she was going to call the police and tell them that he had hit her. E.Z. said she would rather see Castaneda in jail than with anyone else. Rosa's landlord eventually intervened after hearing the noise.

8

Reyes told Rosa about the fight that Reyes had with E.Z., but Rosa could not recall when Reyes told her about it. At trial, Rosa listened to several audio clips of the voice heard over E.Z.'s phone but testified that she was unable to identify the male voice as Castaneda's due to what she characterized as "a lot of distortion." Rosa later testified, however, that the voice on one of the clips "sounded" like Castaneda and was in fact him.

## D.    *The Verdict and Sentencing*

On November 6, 2019, the jury found Castaneda guilty of inflicting corporal injury on an intimate partner (§ 273.5, subd. (a)). The jury acquitted Castaneda of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) but found him guilty of the lesser included offense of misdemeanor simple assault (§ 240). The trial court struck Castaneda's prior strike under section 1385 and sentenced him to the middle term of three years for count 1 and a concurrent six-month term for the misdemeanor simple assault.

## II.    DISCUSSION

On appeal, Castaneda argues that multiple prosecutorial errors in this case require the reversal of the judgment. He argues that the prosecutor committed misconduct by misstating the burden of proof and reasonable doubt standard, baselessly accusing the defense witnesses of lying, denigrating defense counsel, and burdening his constitutional rights by arguing that he used his right to discovery to fabricate a defense.

## A. *Legal Principles and Standard of Review*[7]

" '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667 (*Centeno*).) Bad faith is not required. (*Id.* at p. 666.) "A prosecutor's conduct violates the Fourteenth Amendment of the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*Ibid.*)

Although a prosecutor " 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom[,]' " it is prosecutorial error to misstate the law or the evidence. (*People v. Fayed* (2020) 9 Cal.5th 147, 204 (*Fayed*).) It is also prosecutorial misconduct to disparage defense counsel in front of the jury (*People v. Young* (2005) 34 Cal.4th 1149, 1193) or to otherwise "appeal to the passions and prejudices of the jury," which is " ' "out of place [in] an objective determination of guilt." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 (*Seumanu*).) But "any allegedly improper statements by the prosecutor must be considered in light of the entire argument." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 789 (*Holmes*).) " 'A defendant asserting prosecutorial misconduct

---

[7] Castaneda did not object or request an admonition to the majority of the prosecutor's challenged remarks. To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection to the challenged statement and ask the trial court to admonish the jury to disregard the improper statements. (*People v. Fayed* (2020) 9 Cal.5th 147, 204.) However, as Castaneda argues that defense counsel was ineffective for failing to object to the alleged instances of misconduct, we reach the merits of his claims.

must . . . establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.' " (*Fayed*, *supra*, 9 Cal.5th at p. 204.)

"Although we generally review claims of prosecutorial error for an abuse of discretion [citation], we independently examine what the law is [citations] and 'objective[ly]' examine how a 'reasonable juror' would likely interpret the prosecutor's remarks [citations], bearing in mind that ' "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" ' [Citation.]" (*People v. Collins* (2021) 65 Cal.App.5th 333, 340 (*Collins*).)

## B. *Misstating the Reasonable Doubt Standard*

### 1. *Background*

During closing argument, the prosecutor acknowledged her burden of proving guilt "beyond a reasonable doubt," which is "the highest standard we have [under] the law, but it's not an impossible one." The prosecutor explained: "You must have an abiding conviction that the charge is true. That's it. No more. No less. And, obviously, the doubt has to be reasonable, reasonable and based on the evidence that has been presented, because in life, everything in law is open to some possible creative, speculative, conjectur[al] doubt or imaginary doubt." The prosecutor then argued that there was both circumstantial and direct evidence in the case, and "[i]f the defense puts up a theory, which they have in this case, and that's also reasonable, and you think about it, and you are like, 'yeah, it could possibly have happened that way when you consider all of the evidence.' Yes. You must find the defendant not guilty."

The prosecutor then continued: "However, when the People's theory is reasonable—I don't think [defense counsel] is going to say that it's not—and the defense theory is unreasonable—again, think about that key piece of evidence, that very first phone call, with [Castaneda's] voice where he knows she's with the cops—if their theory is unreasonable, which [it] is, in fact in this case, then the defendant is guilty. [¶] And the reason I want to stress that is because oftentimes in cases, two sides are presented,

11

and when you take the time to look and evaluate those two sides, especially this case, you can see that one side, the defense side, is completely unreasonable.  You throw that out and find the defendant guilty.  Just like his 'damn last'—'fucking last case with [N.A.]' "

      **2.**     *Analysis*

Castaneda argues that the prosecutor's comments improperly suggested to the jury that it could convict Castaneda if the People's case was "reasonable," thereby lowering the prosecution's burden of proof.  We agree that it was improper for the prosecutor to imply "that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it."  (*Centeno*, *supra*, 60 Cal.4th at p. 671.)

In *Centeno*, the California Supreme Court concluded that the prosecutor is permitted to argue that the jury should reject unreasonable interpretations of the evidence, but it was error for the prosecutor "to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof.*"  (*Centeno*, *supra*, 60 Cal.4th at p. 672.)  Furthermore, it is the prosecutor's burden to prove the case, and although the "prosecution can surely point out that interpretations proffered by the defense are neither reasonable nor credible . . . that conclusion does not relieve or mitigate the prosecutorial burden.  The prosecution cannot suggest that deficiencies in the defense case can make up for shortcomings in its own."  (*Id.* at p. 673.)

Here, the prosecutor at first properly argued that the jury could disregard unreasonable interpretations of the evidence and that the defense's theory was unreasonable.  (*Centeno*, *supra*, 60 Cal.4th at p. 672.)  The prosecutor can fairly argue that the jury should reject unreasonable factual inferences from circumstantial evidence— and, along those same lines, the prosecutor can argue that a reasonable factual inference pointing to guilt might be compulsory if all other inferences suggested by the circumstantial evidence are unreasonable.  (*Ibid.*; *People v. Brasure* (2008) 42 Cal.4th 1037, 1058 ["an *unreasonable* inference pointing to innocence is, by definition, not

12

grounds for a *reasonable* doubt"].)[8] Yet the prosecutor cannot conflate the concept of rejecting an unreasonable evidentiary inference with the standard of proof beyond a reasonable doubt on the ultimate issue of guilt. (*Centeno*, *supra*, at p. 672.) And here, the prosecutor improperly went on to suggest that if the defense theory was "unreasonable" and the prosecution's theory was "reasonable," then the jury must find Castaneda guilty. Effectively, the prosecutor suggested that "deficiencies in the defense case can make up for shortcomings in its own" (*id.* at p. 673) and further suggested that a "reasonable" standard was sufficient to satisfy proof beyond a reasonable doubt (*id.* at p. 672). This statement misstated the prosecutor's burden of proof and standard of reasonable doubt.

However, even though the prosecutor's statement was erroneous, reversal is not required absent prejudice. We discuss prejudice in part II.F., *post*.

C. *Defense Witnesses as Liars*

1. *Background*

During closing argument, the prosecutor argued that Castaneda, Rosa, and Reyes had fabricated a defense that involved Reyes and E.Z. getting into an altercation together. The prosecutor also argued that Reyes and Rosa had lied when they testified that they did not recognize Castaneda's voice on the body-worn camera video, stating: "Ms. Reyes and Ms. Castaneda, I played this for them. This portion of the body-worn camera footage, as well as the second call [Castaneda] makes almost immediately after the first. And they, with little smirks on their faces, tried to say, 'Oh, it's garbled. It's not clear. It's staticky. I don't recognize their voice.' [¶] Liars."

---

[8] This applies only to circumstantial evidence. " 'Circumstantial evidence involves a two-step process—first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence—but direct evidence stands on its own. So as to direct evidence no need ever arises to decide if an opposing inference suggests innocence.' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166.)

13

The prosecutor also suggested at times that the person that defense investigator Alvarez spoke with over the phone was not E.Z. but was in fact someone else—arguing that "[E.Z.] *allegedly* called and spoke to a defense investigator."

Next, the prosecutor argued that Castaneda and Reyes concocted a defense together, stating: "They must have thought, in between September 3 and October, okay, this story about how [E.Z.] doesn't know who this person is. It's not good enough. It's not going to be good enough. We need to have someone come in and actually say that they were in a fight with her. So who do we have? Who do we have that is willing to do that? 'Oh Mariah, you are my sister's best friend. Come on in.' But that's a problem, right? Because, obviously, Mariah and [E.Z.] knew each other well. If the first statement was accurate about who she got into a fight with—she would have said, if she's trying to help the defendant, 'Hey, it's this woman Mariah. I worked with her [at the restaurant]. Here is how you can get in contact with her.' But whoever first spoke to the investigator didn't say that, because they hadn't made up that part of the story yet."

The prosecutor then referenced the movie, *My Cousin Vinnie*, and described a scene in the movie where the protagonist discovers that a prosecutor's discovery obligations require the disclosure of evidence. Following this vignette, the prosecutor argued, "They know. They have the police report. The jail calls. The body worn camera footage. They have it all, which gives them the advantage of, 'how do we craft a defense around this?' Okay? So she stops at the intersection of Monterey Road and Capital Expressway. Okay. 'So we need to have this staged fight occur somewhere, some random—some place nearby. We have got to fit it in because it's not true.' "

And finally during rebuttal, the prosecutor argued again that both Reyes and Rosa lied when they testified, arguing: "It's an unfortunate reality in our criminal justice system that witnesses take an oath, and they swear to tell the truth, the whole truth, and nothing but the truth, for most people, that actually means something and they endeavor to provide the truth, the whole truth, and nothing but the truth to the best of their ability.

14

To other people, those are just words, and they have no problems getting up on the witness stand saying they're going to tell the truth, the whole truth, and nothing but the truth and then lying to you. And that's exactly what Ms. Reyes and what Ms. Castaneda did."

### 2.    *Analysis*

Castaneda argues that the prosecutor committed misconduct by arguing, in his view without evidence, that he and defense witnesses Reyes and Rosa conspired together to commit perjury and fabricate evidence, and that Reyes and Rosa were liars and perjurers. We disagree.

Generally, a "prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . ." (*People v. Pinholster* (1992) 1 Cal.4th 865, 948 [no misconduct when prosecutor referred to a defense witness as a " 'weasel' " and suggesting another witness was a "perjurer," or that witnesses had not been " 'following the script' "], disapproved of on a different point as stated in *People v. Williams* (2010) 49 Cal.4th 405, 459.) Moreover, "the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*People v. Bemore* (2000) 22 Cal.4th 809, 846 (*Bemore*).) It is not, for example, misconduct for the prosecutor to "criticize[] the defense theory of the case because it lacks evidentiary support." (*Ibid.*)

Accordingly, "[i]nterpretive, but fair, comment on evidence submitted to the jury is proper." (*People v. Ellis* (1966) 65 Cal.2d 529, 539 (*Ellis*).) And here, the prosecutor's comments were an appropriate comment on the evidence, including the "conflicts and inconsistencies in the evidence and those evidentiary matters that render the prosecution testimony more believable than that submitted by the defense." (*Ibid.*) Thus, it was not misconduct for the prosecutor to argue that Rosa's and Reyes's respective testimony lacked credibility because of certain logical inconsistencies—for

15

example, that both witnesses, despite their close relationship with Castaneda, had purportedly forgotten about E.Z.'s confrontation with Reyes until shortly before Castaneda's trial. Moreover, it was not misconduct for the prosecutor to argue that Reyes's account of how she and E.Z. coincidentally came across each other while E.Z. was driving down a street during the evening hours strained credulity: the prosecutor's argument on this point was a fair comment on the evidence.

Nor was it misconduct—on this record—for the prosecutor to suggest that the defense witnesses had fabricated a defense. "The prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1052.) For example, in *Mitcham*, the prosecutor argued that the defendant and codefendant had been riding side by side together, en route to the crime scene, and suggested that the men may have had conversations about why the defendant was dressed the way he was dressed, or that the codefendant knew of the defendant's objective to commit a robbery. (*Id.* at p. 1050.) The defendant argued that the prosecutor had improperly engaged in speculation as to the possible discussions between the two men and had referred to facts outside of the record by suggesting that the men drove around before the crimes. (*Id.* at p. 1051.) *Mitcham* concluded that the prosecutor's comments constituted reasonable inferences drawn from evidence that the codefendant had driven to the scene prior to the robbery and was observed fleeing with the defendant shortly after the robbery occurred. (*Id.* at pp. 1051-1052.)

Here, as in *Mitcham*, the suggestion that defense was fabricated and the prosecutor's argument and Reyes and Rosa may have discussed how to align their testimony was supported by evidentiary inferences in the record—Rosa and Reyes were good friends, Rosa testified that she was close with her brother, and there were reasons to doubt both witnesses' veracity. Moreover, Castaneda could be heard in one of the body-worn cameras asking E.Z. if she wanted to "play games" by stopping when she saw

police officers, which undermined Reyes's account that the altercation was solely between her and E.Z., and there was evidence that Castaneda was aware of the existence of the police reports based on his jail calls with E.Z. It was a fair inference for the prosecutor to argue that the defense witnesses may have collaborated with each other. The prosecutor did not impermissibly suggest that she *personally* had extrinsic evidence that the witnesses had fabricated their testimony. (See *People v. Johnson* (1981) 121 Cal.App.3d 94, 102 [misconduct for prosecutor to suggest witness's testimony was a lie as prosecutor had reminded the jury that he had personally investigated the case and that he had the personal belief that the witness's testimony was a lie].)

It was also not misconduct for the prosecutor to argue that E.Z. was not the woman who spoke to Alvarez over the phone—the prosecutor based her arguments on the evidence presented: that the defense investigator solely believed the woman to be E.Z. because of the woman's ability to give certain personal identifying information, and that the defense investigator had never met E.Z. and would not have known what her voice sounded like. Although one inference from the evidence is that Alvarez spoke with E.Z., an alternate inference is that Alvarez spoke with someone *claiming* to be E.Z. Though E.Z.'s undisputed refusal to cooperate with the district attorney tended to undermine the inference urged by the prosecutor here, "the reasonableness of inferences counsel draws from matters in evidence ' " 'is for the jury to decide.' " ' " (*Holmes*, *supra*, 12 Cal.5th at p. 787.)

In short, the prosecutor's suggestion that Castaneda and his circle may have fabricated a defense or that the person Alvarez interviewed may not have been E. Z. did not mischaracterize or assume facts not in evidence, these statements were merely permissible comments on the evidence. (*Holmes*, *supra*, 12 Cal.5th at p. 787.)

Moreover, the prosecutor did not commit misconduct when she called Rosa and Reyes liars "with little smirks on their faces" and later, by implication, perjurers who did not take their oaths to tell the truth seriously. For example, in *People v. Edelbacher*

17

(1989) 47 Cal.3d 983, the California Supreme Court held that it is acceptable to call a defendant's out-of-court and in-court statements as " 'lies' " so long as the prosecutor is arguing inferences based on the evidence rather than a personal belief based on matters outside the record. (*Id.* at p. 1030; see also *People v. Williams* (2016) 1 Cal.5th 1166, 1189 [claim that defendant lied and knowingly put on contradictory evidence not misconduct].) The prosecutor did not argue that Rosa's and Reyes's lies warranted Castaneda's conviction—rather, the prosecutor argued that because the witnesses had not told the truth, Castaneda's defense should be rejected. (See *People v. Earp* (1999) 20 Cal.4th 826, 864; but see *Ellis*, *supra*, 65 Cal.2d at pp. 539-541 [misconduct to call defendant perjurer and argue that the defendant's lies warranted his conviction].) Moreover, the prosecutor in this case did not argue that she believed Rosa and Reyes had lied based on her own personal belief; the prosecutor based her arguments on inferences made from their testimony at trial, including the logical inconsistency of their various accounts and the contradiction of their account with E.Z.'s recorded allegations.

In sum, the prosecutor did not commit misconduct when she argued that Rosa and Reyes had lied during their testimony or that the defense was fabricated.

## D. *Denigrating Defense Counsel*

### 1. *Background*

After defense counsel made his closing argument, the prosecutor responded with a rebuttal, reiterating her argument that the woman that defense investigator Alvarez spoke to over the phone was not E.Z. The prosecutor stated: "I do not concede that the woman who called the defense investigator was [E.Z.]. What would have been the easiest way for you to assess that? Ah, yeah, if the investigator had actually recorded that conversation. But as you heard, it is the public defender's office's policy not to record. Interesting. [¶] My job as the prosecutor is to present to you evidence, evidence to convince you of the truth of the charge with an abiding conviction. [¶] The public defender's office doesn't have the same role. Now, they may not be able to, because of

18

law, record a conversation without someone's consent.  But they don't even ask.  They don't even ask."

The prosecutor also subsequently noted:  "And keep in mind.  Another way that would have been very easy for the defense investigator to affirmatively establish whether or not the person she was speaking to was [E.Z.] is to listen to the body-worn camera footage or any of the jail calls so that she could have heard her voice.  And then compared it to the person on the other end of the line.  But as you heard, it's not the public defender's office's practice to give the defense investigators that information.  And so she couldn't even make that comparison."

The prosecutor further argued that it was her burden to present evidence to the jury, "but [the defense] didn't call [E.Z.] either [as a witness].  The defense investigator never went out to Los Baños to even serve her with a subpoena.  They can't make the argument they just made if she testifies."

### 2.    *Analysis*

Castaneda argues that the prosecutor improperly implied that defense counsel was complicit in fabricating a defense by deliberately avoiding investigatory actions that would have revealed incriminating evidence.

"[P]rosecutorial comment upon a defendant's failure 'to introduce material evidence or to call logical witnesses' is not improper.  [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 263 [argument that defendant had failed to adduce expert psychiatric testimony to support claim that he was depressed and suicidal during confession was not misconduct]; *People v. Ratliff* (1986) 41 Cal.3d 675, 691 [argument that defendant had failed to provide any alibi testimony not misconduct].)  Thus, it was not misconduct for the prosecutor to argue that the defense failed to introduce material evidence, such as a recording of the defense investigator's interview with E.Z. that could have more conclusively ascertained the caller's identity.  It was also not misconduct for the prosecutor to call into question the defense's decision not to secure E.Z. as a defense

19

witness. Although some of the prosecutor's comments about the defense's failure to produce logical witnesses was proper, we agree that some of the prosecutor's remarks about the policies of the public defender's office were problematic.

We agree with Castaneda that in several instances, the prosecutor's argument crossed the line between permissible and impermissible argument. In part, the prosecutor's arguments pertaining to the policies employed by the public defender's office and its role as compared to the prosecution is troublesome. The prosecutor noted that the public defender's office policy was not to record interviews and that her job as a prosecutor is to "present to you evidence, evidence to convince you of the truth of the charge with an abiding conviction." The prosecutor then continued that "[t]he public defender's office doesn't have the same role." The Attorney General argues that the prosecutor was merely arguing that the burden is on the prosecution to present evidence of an accused's guilt and that the defense is not required to present a case or to prove anything to the jury.

Yet the Attorney General's argument ignores the clear implication of the rest of the prosecutor's observation that the public defender's investigator did not even ask if she could record the conversation with E.Z. Although we " ' " 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements" ' " (*Collins*, *supra*, 65 Cal.App.5th at p. 340), the prosecutor's statement suggested that the public defender's office, unlike the prosecution, is not interested in the truth of the matter and instead implemented policies to subvert its investigators' collection of potentially incriminating evidence. Generally, it is misconduct to argue that "law enforcement has an obligation to ascertain 'the true facts surrounding the commission of the crime' [citation], which defense counsel do not." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 59 (*Hawthorne*), fn. omitted.) These statements "interject an extraneous generalization, potentially diverting the jury's attention from the specifics upon which they must focus. Moreover, this generalization

20

'is not one that is shared by all judges or courts.  It paints with too broad a brush.' " (*Id.* at p. 60.)

In this case, the prosecutor's arguments on this point tended to suggest, by implication, that defense counsel was part of an effort to fabricate a defense—i.e., by remarking that it was "interesting" that the defense investigator, who was employed by the public defender's office, did not record the conversation with E.Z.  "It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]." (*Bemore*, *supra*, 22 Cal.4th at p. 846.)  By suggesting that the public defender's office has implemented policies that willfully prohibited the collection of potentially incriminating evidence, the prosecutor was necessarily implying that defense counsel was complicit in a false defense.  (See *Seumanu*, *supra*, 61 Cal.4th at p. 1338 [misconduct to impugn integrity of defense counsel, such as implying that defense counsel put forward a "sham defense"].)

However, even if we assume that the prosecutor's statements constituted misconduct, reversal is not required unless Castaneda suffered prejudice.  We discuss in part II.F., *post*, the prejudicial impact of the prosecutor's remarks.

E.    *Burdening the Right to Discovery*

1.    *Background*

During closing arguments, the prosecutor made two references to Castaneda's possible use of discovery to craft his defense.  First, during her initial closing argument, the prosecutor argued that Castaneda, Reyes, and Rosa "have the police report.  The jail calls.  The body-worn camera footage.  They have it all, which gives them the advantage of, 'How do we craft a defense around this?' "

And during her rebuttal, arguing that the woman who spoke to Alvarez was not E.Z., the prosecutor suggested that pretrial discovery had supplied Castaneda with E.Z.'s driver's license number.  Defense counsel objected on the ground that this argument denigrated defense counsel.  When the prosecutor clarified that she was referring to

21

Castaneda, not to counsel, defense counsel asked to approach the bench with a different objection. After an unreported sidebar, the prosecutor continued her argument, describing that E.Z. had mentioned in a jail call that she had obtained a copy of the police report and that Castaneda likely had access to E.Z.'s personal identifying information because of their relationship.

## 2. *Analysis*

Castaneda argues that the prosecutor committed misconduct by arguing that he may have used information obtained through discovery to fabricate his defense. We conclude that no misconduct occurred.

Primarily, Castaneda relies on *Brady v. Maryland* (1963) 373 U.S. 83, 86-87 for the proposition that the right to discovery is rooted in the Fourteenth Amendment right to due process. In support of his argument that the prosecutor improperly burdened his constitutional rights with her remarks, Castaneda analogizes cases that have held that it is misconduct for a prosecutor to argue that a defendant's exercise of constitutional rights like the right not to testify, the right to remain silent, or the right to counsel, is indicative of guilt. (See *Griffin v. California* (1965) 380 U.S. 609, 615 [Fifth Amendment forbids comment by prosecution on the accused's silence]; *People v. Fondron* (1984) 157 Cal.App.3d 390, 400 [reference to defendant's postarrest silence during closing argument was improper]; *People v. Fabert* (1982) 127 Cal.App.3d 604, 608-610 [defendant cannot be penalized for exercising Fifth Amendment right to remain silent in custody]; *United States v. Prescott* (9th Cir. 1978) 581 F.2d 1343, 1352 [evidence that defendant refused to consent to entry into home without a warrant deemed inadmissible].)

Yet none of the constitutional rights cited above are at issue in this case. The prosecutor did not comment on Castaneda's decision not to testify; the prosecutor argued that the jury could reasonably infer based on the evidence that Castaneda had access to E.Z.'s personal identifying information based on his relationship with her and his access to the police reports. Indeed, during one of the jail calls between Castaneda and E.Z.,

22

E.Z. told Castaneda that she had obtained the police report and the two had a conversation about some of the charges listed therein. The argument that Castaneda had access to the police reports was therefore supported by the evidence, and the claim that Castaneda could have used that information to tailor his defense was a fair comment on the evidence. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1343 [not misconduct when argument was fair comment on evidence].)

Moreover, not all arguments that reference a defendant's constitutional rights constitute misconduct—in a somewhat analogous situation, the defendant in *Portuondo v. Agard* (2000) 529 U.S. 61 argued that the prosecutor committed misconduct by commenting on his presence at trial, which afforded him the ability to fabricate his testimony. (*Id.* at p. 65.) The defendant argued that the prosecutor's comments unlawfully burdened his Sixth Amendment right to be present at trial and be confronted with the witnesses against him. (*Ibid.*) The United States Supreme Court rejected this claim, concluding that it was appropriate to treat a testifying defendant the same as any other witness; thus, it was not inappropriate for a prosecutor to comment on the fact that "a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony." (*Id.* at p. 73.)

Accordingly, we conclude that that the prosecutor did not commit misconduct by referencing Castaneda's discussion of the police report.

**F.** *Cumulative Error*

Here, we have found two instances of error in the prosecutor's comments: the prosecutor's misstatement regarding the burden of proof and standard of reasonable doubt, and the prosecutor's comments referencing the public defender's role and its office's policies regarding the collection of evidence. We conclude that even if we cumulate the impact of these errors, reversal is not required because the errors are harmless.

Even where a prosecutor commits error, reversal is not required unless a defendant has suffered prejudice. "Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 to the extent federal constitutional rights are implicated, and *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)], if only state law issues were involved." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564; *People v. Wallace* (2008) 44 Cal.4th 1032, 1070.) Under *Watson*, reversal is required when it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) As the prosecutor's alleged misstatement regarding the reasonable doubt standard implicates Castaneda's federal constitutional rights, we apply the *Chapman* harmless-beyond-a-reasonable-doubt standard to determine whether the cumulative effect of the two errors requires reversal of Castaneda's convictions. (*People v. Woods* (2006) 146 Cal.App.4th 106, 117 (*Woods*).)

Considering the entirety of the record, we conclude that any error was harmless. Despite her later misstatement about the reasonable doubt standard, the prosecutor accurately referenced the reasonable doubt standard in her earlier comments before the jury. Defense counsel also countered the prosecutor's remarks during his closing argument, noting that "[t]he prosecution has posed to you a false analogy where there [are] only two alternative versions of events." Defense counsel also reiterated during his closing argument that it was the prosecutor's burden to prove beyond a reasonable doubt that Castaneda was guilty of the charged offenses. Defense counsel argued that so long as the jury found the defense "reasonably possible," that means that the prosecutor had not met her burden to remove all reasonable doubt. Additionally, the jury was instructed on the proper reasonable doubt standard, that the attorneys' arguments were not evidence and that if there was any conflict between the attorneys' arguments and the given instructions, the instructions controlled. We must presume that the jury followed the instructions. (*People v. Chism* (2014) 58 Cal.4th 1266, 1299.)

24

We likewise conclude that the prosecutor's remarks about the public defender's office and defense counsel's role were not "so inflammatory as to distract the jury from a thorough and reasoned evaluation of the evidence." (*Hawthorne*, *supra*, 4 Cal.4th at p. 61.) It was the defense theory and the veracity of defense witnesses (testifying or not) that was the principal focus of the prosecutor's criticism. The disparagement of the public defender's office here—for its failure to discern, test, or forestall what the prosecutor permissibly characterized as a fabrication by Castaneda's closest associates— was collateral to the prosecutor's legitimate line of attack. Accordingly, this is not a circumstance in which disparagement of Castaneda's legal representative was a stratagem for inflaming the jury against an otherwise passive or unwitting client. Taken in context, the prosecutor's comments as to Alvarez and her account of the public defender's office policy and practice limiting her actions were largely focused on the defense's seeming failure to anticipate rudimentary scrutiny of a recantation that was central to Castaneda's chosen theory of defense.

Moreover, we do not find this case to be close. Although E.Z. did not testify at trial, the prosecution presented multiple videos that captured her initial statements to the officers describing Castaneda's assault against her. The jury was also presented with evidence of Castaneda's prior history of violence against an intimate partner—one who claimed not to recall any of his acts of violence despite her apparently spontaneous and immediate accounts of abuse. Although N.A. testified she did not remember any of the events, the jury received evidence of Castaneda's associated convictions as well as 911 recordings of an audibly distraught N.A. and corroborating statements of bystanders to the cinema vandalism and threats.

Furthermore, on this record, the jury could have readily discounted Reyes's ostensible corroboration of E.Z.'s recantation. Given that E.Z. told Alvarez that she only knew the woman she fought with because they had mutual friends, Reyes's status as E.Z.'s employer could only have undermined E.Z.'s attempt to exculpate Castaneda.

25

Moreover, the jury could have reasonably discredited Reyes's testimony, given her close relationship to both Rosa and Castaneda, and deemed implausible that neither Rosa nor Reyes would have recalled the fight with E.Z. or understood its significance in relation to Castaneda's criminal case until shortly before Castaneda's trial.

Castaneda argues that jury's acquitting him of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) but convicting him of the lesser offense of simple assault indicates that the jury found some of the evidence unpersuasive in certain respects, thereby heightening the potential for prejudice from the prosecutor's improper remarks. The sole logical inference we can draw from the verdicts, however, is that the jury credited E.Z.'s account of the assault to police at the scene and at the hospital but found inadequate the evidence that Castaneda, in committing the assault, used force *likely to produce great bodily injury*. We are not persuaded that the jury verdicts reflect any doubt as to whether it was Castaneda who assaulted E.Z. Moreover, though it is true that the jury asked several questions during deliberations, none of the questions particularly suggested that this was a close case as to Castaneda's underlying guilt.[9]

For these reasons, we conclude that even though the prosecutor's comments constituted misconduct, any error was harmless beyond a reasonable doubt. (See *Woods*, *supra*, 146 Cal.App.4th 106, 117.)

### III. DISPOSITION

The judgment is affirmed.

---

[9] For example, the jury initially asked for a transcript of the entire trial. In response, the trial court directed it to instead specify what transcripts it desired by witness or by subject matter. The jury, however, did not resubmit its request for transcripts. The jury also asked for a clarification about the differences between counts 1 and 2, and also asked for call logs between E.Z. and Castaneda the night of the offense and for information about when the prosecutor and defense counsel were assigned the case.

26

_____
LIE, J.

WE CONCUR:


_____
GROVER, ACTING P.J.



_____
WILSON, J.




*People v. Castaneda*
H048397